CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
LEIF DAUTCH (CABN 283975)
ASEEM PADUKONE (CABN 298812)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    mari.overbeck@usdoj.gov
    leif.dautch@usdoj.gov
    aseem.padukone@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 21-CR-328-YGR |
| Plaintiff, | UNITED STATES' OMNIBUS SENTENCING MEMORANDUM FOR TRIAL DEFENDANTS |
| v. | Date: June 17, 2024 |
| DAVID CERVANTES, JAMES PEREZ, GEORGE FRANCO, and GUILLERMO SOLORIO, | Time: 8:30 a.m. |
| | Court: Hon. Yvonne Gonzalez Rogers |
| Defendants. | |

The United States respectfully submits this omnibus Sentencing Memorandum as to trial defendants David Cervantes, James Perez, George Franco, and Guillermo Solorio, who are scheduled to be sentenced on June 17 for racketeering conspiracy in violation of 18 U.S.C. § 1962(d).

## I. **INTRODUCTION**

David Cervantes, James Perez, George Franco, and Guillermo Solorio are four of the top leaders of the violent and lucrative La Nuestra Familia ("NF") prison gang. Cervantes is currently serving a life sentence in California for murder. While in California state prison, he became a member of the NF and rose through its ranks, eventually serving as one of three NF "Generals," namely, the General Advocates Office ("GAO"). Perez, who is likewise serving a life sentence in California for murder, also rose through NF ranks while incarcerated to become an NF General, namely, the General of the Pintas ("GOP"). Franco also became a high-ranking NF member while incarcerated on an indeterminate state sentence of fifteen years to life for second-degree murder—he has held a leadership role for at least the length of the conspiracy window charged in this case as a member of the NF's "Inner Council." Solorio, who also is serving a life sentence in California for murder, joined the ranks of the NF and was promoted to a "Category III" member who was elevated to the Inner Council in 2019.

From behind prison walls, these four defendants and their co-conspirators continued to engage in criminal activity, including large-scale drug trafficking, money laundering, and violence. Following a multi-month trial in 2024, each defendant was found guilty of RICO conspiracy, including with respect to one or more Special Sentencing Factors charging acts involving murder. The government requests that the Court impose a custodial term of 300 months in federal prison for both Cervantes and Perez, and a custodial term of 240 months in federal prison for Franco and Solorio, to be served immediately given that the State of California has relinquished primary jurisdiction to the federal government. Once each defendant has completed any imposed federal term, he should be returned to state custody, and in the event of any future parole, he can then serve his five-year term of federal supervised release.

## II. **OFFENSE CONDUCT**

As this Court well knows, the criminal enterprise known as NF is comprised of a relatively small number of "made" members who sit atop a sprawling network of Norteño gang members who reside in neighborhoods and prisons throughout California. Cervantes PSR at ¶¶ 23–24; Perez PSR at ¶¶ 23–24;

Franco PSR at ¶¶ 24–25; Solorio PSR at ¶¶ 24–25. The highest authority in the organization lies with the three Generals. As the evidence at trial demonstrated, the three Generals during the entire conspiracy period at issue in this case included trial defendants David Cervantes (who was the "GAO") and James Perez (who was the "GOP"). Cervantes PSR at ¶¶ 25, 33; Perez PSR at ¶¶ 25, 33. Just below the Generals in the NF hierarchy are the four members of the Inner Council. The three Generals and four Inner Council members combine to form the General Council, which is responsible for making significant decisions in conducting the affairs of the organization. Cervantes PSR at ¶ 26; Perez PSR at ¶ 26; Franco PSR at ¶ 27; Solorio PSR at ¶ 27. As proven at trial, defendant George Franco was a longtime NF member and an Inner Council member, as was Guillermo Solorio, who replaced Matt Rocha as a member of the Inner Council in 2019, and who was selected for this seat due to the "work" he had put in for NF, including his prolific drug-trafficking activities. Franco PSR at ¶ 34; Solorio PSR at ¶¶ 34–35.

### A.  Defendants' Involvement in the Enterprise

#### 1.  David Cervantes aka "DC"

At trial, Cervantes was consistently identified by witnesses as a longtime NF leader who held the position of GAO. PSR at ¶¶ 33, 35; *see, e.g.*, Trial Tr. 6/25/24 at 37:12–22 (Donal Moran); Trial Tr. 7/10/24 at 52:1–20 (Joshua Cortez); Trial Tr. 7/16/24 at 117:1–3 (John Muzquiz); Trial Tr. 7/30/24 at 59:5-12 (Derek Williams); Trial Tr. 7/31/24 at 24:10–14 (Joshua Soto); Trial Tr. 8/1/24 at 60:7-13 (Duane Jefferson). He participated in drug transactions within prison. PSR at ¶¶ 36-37; Trial Tr. 7/30/24 at 126:3-9. The wire interceptions captured Cervantes's personal participation in the enterprise's affairs, including discussions of his regiment (Kings County), the promotion of NF members to the IC, and the plot to kill John "Shanks" Reyna in retaliation for the murder of a Norteño foot solider in Cervantes's territory. PSR at ¶¶ 35–37; *see, e.g.*, Trial Ex. 434, 452.

#### 2.  James Perez, a/k/a "Conejo"

Cooperating witnesses consistently identified James Perez as an NF General during the conspiracy period, specifically the "GOP." PSR at ¶¶ 33, 35; Trial Tr. 6/25/24 at 39:24–40:4 (Moran); Trial Tr. 7/10/24 at 53:8-20 (Cortez); Trial Tr. 7/17/24 at 30:3-7 (Muzquiz); 7/31/24 Trial Tr. at 47:8–48:10 (Soto); 8/1/24 Trial Tr. at 33:14-15 (Jefferson); 8/6/24 Trial Tr. at 41:13-20 (Rocha). In this role,

he was responsible for maintaining authority over all NF regiments within the California prison system by appointing NF members and associates to leadership positions within CDCR facilities, as well as overseeing and regulating criminal activity occurring in these facilities. PSR at ¶¶ 25, 34, 37; *see* Trial Ex. 1.

The wiretaps captured Perez acting in his capacity as an NF leader, including discussions about the complaint he filed against Matt Rocha, and the eventual demotion (and replacement) of Rocha. PSR at ¶¶ 36-37. For example, the jury heard an intercepted call from February 8, 2019, between Luna and Perez where Perez summarized his allegations against Rocha as involving stolen drugs and red-on-red violence. Trial Ex. 399. Perez was captured in many other intercepted calls discussing NF business. *See* Trial Exs. 404, 410, 430, 446. Perez was also heavily involved in the enterprise's drug trafficking. PSR at ¶ 37; *see* Trial Tr. 8/1/24 at 31:10–37:4; Trial Tr. 7/31/24 at 62:18–63:22.

### 3.   George Franco, a/k/a "Puppet"

Cooperating witnesses likewise identified George Franco as a longtime NF member who sat on the Inner Council. PSR at ¶ 35; *see, e.g.,* Trial Tr. 6/25/24 at 52:4-11 (Moran); Trial Tr. 7/10/24 at 53:8–20 (Cortez); Trial Tr. 7/16/24 at 143:2–6 (Muzquiz); Trial Tr. 8/1/24 at 58:8-13 (Jefferson); Trial Tr. 8/6/24 at 43:16-18 (Rocha). His position on the Inner Council was confirmed by the intercepted communications. PSR at ¶¶ 35–37; *see* Trial Exs. 426, 439, 440, 482. Franco was also Regiment Commander of Stanislaus and San Joaquin Counties. PSR at ¶ 25; Trial Tr. 7/16/24 at 147:17–148:20.

### 4.   Guillermo Solorio, a/k/a "Capone from Greenfield"

Witnesses identified Solorio as an active NF member who rose through NF ranks during the conspiracy period, including by holding various leadership roles, including as a member of the notorious Inner Council and as RC of Folsom State Prison, Monterey and Fresno counties. PSR at ¶¶ 35-37; *see* Trial Tr. 6/25/24 at 188:13–17; Trial Tr. 7/30/24 at 68:5–69:9; 70:8-17; Trial Tr. 7/31/2024 at 40:24–41:1, 42:6–43:15 (Soto); Trial Ex. 244 (text message); Trial Exs. 446, 454 (Guillen/Cervantes call). Solorio played an active role in the enterprise's drug trafficking activities, serving as a major supplier of drugs for the organization. PSR at ¶ 37; Trial Ex. 436; Trial Tr. 7/30/24 68:9–69:1 (Williams); Trial Tr. 7/31/24 61:7-25, 64:8–12 (Joshua Soto).

B.     The Enterprise's Pattern of Racketeering Activities

1.     Drug Trafficking

Throughout the trial, the government presented evidence that the NF Enterprise was about generating profits from illicit activities, including drug sales. Cervantes PSR at ¶¶ 28–29; Perez PSR at ¶¶ 28–29; Franco PSR at ¶¶ 29–30; Solorio PSR at ¶¶ 29–30, 37. These activities include smuggling drugs into the prisons to sell to other inmates, as well as the movement of large quantities of narcotics on the streets. Both types of sales are often coordinated by incarcerated NF members using contraband cellphones and accomplices on the outside. Cervantes PSR at ¶ 32; Perez PSR at ¶ 32; Franco PSR at ¶ 33; Solorio PSR at ¶ 33.

The trial evidence established that "Regiment Commanders" were charged with overseeing drug sales and other gang activities on the streets in what NF members called "regiments." Cervantes PSR at ¶ 28; Perez PSR at ¶ 28; Franco PSR at ¶ 29; Solorio PSR at ¶ 29; *see also* Trial Tr. 7/16/24 at 110:24–112:24; Trial Tr. 6/25/24 at 31:2–20; Trial Exs. 245, 375, 396. The jury heard evidence that each of the trial defendants himself served as a Regiment Commander of one or more counties in California during the conspiracy window. Cervantes PSR at ¶ 34 (Kings County); Perez PSR at ¶ 34 (San Mateo County); Franco PSR at ¶ 35 (San Joaquin County and Stanislaus County); Solorio PSR at ¶ 35 (Fresno County and Monterey County).

2.     Money Laundering

Enterprise members shared and concealed these criminal proceeds through the use of, among financial platforms, Green Dot. Green Dot accounts would be opened using the names of third parties to conceal the nature of the funds and avoid detection by law enforcement/CDCR officials. *See, e.g.*, Trial Tr. 6/25/24 at 170:20–172:4 (Moran); Trial Tr. 7/10/24 119:9–120:9 (Cortez); Trial Tr. 7/11/24 at 14:10–19 (Cortez); Trial Ex. 526 (Green Dot card); Trial Tr. 7/16/24 at 152:10–153:8 (Muzquiz); Trial Tr. 7/31/24 at 59:11–18 (Soto).

3.     Murder Conspiracies and Attempted Murders

The trial record also proved that NF engaged in violence inside the California prison system, including attempting and conspiring to murder members who had violated NF rules. The government presented evidence of six charged special sentencing factors against various combinations of the

defendants, with the jury ultimately returning "yes" findings on 12 of 13 possible offenses across all four defendants.

### (i) Conspiracy to Murder Lorenzo Guzman, a/k/a "Lencho"

In 2014 and 2015, NF leaders at Pelican Bay State Prison—including Cervantes, Perez, and Franco—became aware of allegations that NF member Lorenzo "Lencho" Guzman had abused his authority, had stolen money from the NF, and had insinuated his wife into NF business to such an extent that she was able to testify in a state trial against Guzman and other members of the Santa Clara Regiment. Cervantes PSR at ¶ 38; Perez PSR at ¶ 39; Franco PSR at ¶ 38; *see also* Trial Tr. 6/25/24 at 106:5–11. An investigation was conducted, and the General Council found Guzman guilty and ordered that he should be killed. The government introduced several prison kites, authored by Moran, which outlined the plot to kill Guzman. *See e.g.*, Trial Exs. 99, 103-1 & 2, 105-1; 6/25/24 Trial Tr. at 123:2-4; 8/6/24 Trial Tr. at 54:2-4. These kites were intercepted by prison guards, and Guzman was moved before he could be attacked. Cervantes, Perez, and Franco each was found guilty of conspiring to kill Lencho. Cervantes PSR at ¶ 39; Perez PSR at ¶ 40; Franco PSR at ¶ 39.

### (ii) Attempted Murder of Antonio Villagrana, a/k/a "Sombras"

On December 12, 2015, Antonio Villagrana, a/k/a "Sombras," was attacked at Solano State Prison. Cervantes PSR at ¶ 41; Perez PSR at ¶ 41; *see also* Trial Tr. 7/11/24 at 10:13-22. He was stabbed over 20 times in the neck, head, face, ear, right shoulder, and both hands. Cervantes PSR at ¶ 41; Perez PSR at ¶ 41; Trial Tr. 7/11/24 at 70:22–71:2. James Perez told Rocha that Sombras had continuously broken the gang's rules, which is why Perez and Cervantes decided to have him removed. Trial Tr. 8/7/24 at 13:1–6. Cervantes and Perez each was found guilty of aiding and abetting the attempted murder of Villagrana. Cervantes PSR at ¶ 41; Perez PSR at ¶ 41.

### (iii) Attempted Murder of John Muzquiz, a/k/a "Knockers"

On April 20, 2016, Muzquiz was attacked by NF members Sleepy Yrigollen, Big Evil Rodriguez, and Rudy Villafranco. Cervantes PSR at ¶ 43; Perez PSR at ¶ 43; *see also* Trial Tr. 7/30/24 at 9:12-14, 28:15-18. Muzquiz was stabbed 20 times in the head, eye, neck, ribs, and upper chest, among other lacerations. Cervantes PSR at ¶ 43; Perez PSR at ¶ 44; *see also* Trial Tr. 7/17/24 at 36:14-5. During the wiretap interceptions in 2019, Perez told IC member Sammy Luna that the "stuff with

Knockers" had been "reported, investigated, and given the okay from 'The Old Guy,'" a reference to Cervantes. Cervantes PSR at ¶ 42; Perez PSR at ¶ 42; *see also* Trial Ex. 401; *see also* Cervantes PSR at ¶ 44 and Perez PSR at ¶ 44 (admissions made by other NF members regarding their intent to kill). The jury found true the special finding that Cervantes and Perez aided and abetted in (or reasonably could have foreseen) the attempted murder of Muzquiz. Cervantes PSR at ¶ 44; Perez PSR at ¶ 44.

### (iv)   Conspiracy to Murder John Reyna, a/k/a "Shanks"

The jury heard evidence of a conspiracy in January 2019 to kill John Reyna, a/k/a "Shanks," in retaliation for his killing of an NF-aligned man in Kings County. The conspiracy was captured over intercepted conversations between Cervantes, Guillen, and Luna. Cervantes PSR at ¶ 45; *see e.g.*, Trial Exs. 381, 382. In one call, Cervantes told Guillen that Shanks's "coffin's already been stamped." Cervantes PSR at ¶ 45; Trial Ex. 452. The jury found true the special finding that Cervantes conspired to kill Reyna. Cervantes PSR at ¶ 45.

### (v)   Attempted Murder of Matthew Rocha, a/k/a "Mateo"

On July 18, 2019, Rocha was attacked by multiple NF members and associates, sparking a riot between different factions within the NF. Trial Tr. 8/6/24 at 8:17–22. NF member Mikio Washington attacked Rocha with an 8-inch knife and stabbed Rocha in his upper chest, middle chest, and arm. Cervantes PSR at ¶ 46; Perez PSR at ¶ 45; Franco PSR at ¶ 40; Solorio PSR at ¶ 38; *see also* Trial Tr. 8/7/24 at 170:6–9; 8/12/24 at 21:19–23. Soon thereafter, NF member Joe "Travieso" Ramirez approached Rocha, pulled out a knife, and told Rocha that this was coming from the GC. Trial Tr. 8/7/24 at 23:1–24:8. Travieso's knife hit Rocha's chest near the solar plexus. *Id*. at 24:17–25:19; *see also* Cervantes PSR at ¶ 46; Perez PSR at ¶ 45; Franco PSR at ¶ 40; Solorio PSR at ¶ 38.

The evidence showed that the General Council, which included Cervantes, Perez, Franco, and Solorio at the time, ordered Rocha killed. Cervantes PSR at ¶ 46; Perez PSR at ¶ 45; Franco PSR at ¶ 40; Solorio PSR at ¶ 38; *see also* Trial Tr. 6/25/24 at 178:16-23; 188:1–4, 188:21–23, 189:1–3. After the attack, Travieso told Rocha that he participated in the attack because of an order from the GC that had been filtered down from Chino Douglas. Trial Tr. 6/25/24 at 32:20–33:9. The GC's responsibility for this attempted murder was confirmed by a filter issued after the attack, which accused Rocha of various violations of NF rules, including plotting against the leadership; the filter explained that was

why Rocha had been "deemed" and hit. *See* Cervantes PSR at ¶ 46; Perez PSR at ¶ 45; Franco PSR at ¶ 40; Solorio PSR at ¶ 38; *see also* Trial Ex. 115.

The jury found true the special finding that Cervantes, Perez, Franco, and Solorio aided and abetted in (or reasonably could have foreseen) the attempted murder of Rocha. Cervantes PSR at ¶ 46; Perez PSR at ¶ 45; Franco PSR ¶ 40; Solorio PSR at ¶ 38.

## III.   GUIDELINES CALCULATION

Based on the evidentiary record described above, the government agrees with Probation's calculations of the applicable sentencing guidelines for each trial defendant. Specifically, for Count One, the PSRs apply U.S.S.G. § 2E1.1 (the offense guideline for racketeering conspiracy) and attribute to each defendant the underlying racketeering acts (murder conspiracy and/or attempted murders) for which they were convicted by the jury—each of which are listed as "pseudo counts" for the purposes of the guideline calculation. For each of the murder "pseudo counts"—which were individually alleged in the indictment and found true beyond a reasonable doubt by the jury on the verdict form, the PSR used the guideline for the underlying offense of either conspiracy to commit murder or attempted murder in setting the base offense level at 33. *See* Cervantes PSR at ¶¶ 52, 64, 70, 75; Perez PSR at ¶¶ 51, 57, 63, 69; Franco PSR at ¶¶ 46, 52; Solorio PSR at ¶ 43. The PSRs also apply an upward role adjustment for each of the "pseudo counts" based on (1) the defendants' respective roles as NF leaders (*see* Cervantes PSR at ¶¶ 56, 61, 67, 73, 79; Perez PSR at ¶¶ 54, 60, 66, 72; Franco PSR at ¶¶ 49, 55; Solorio PSR at ¶ 46); and (2) the level of injury suffered by the victims (*see* Cervantes PSR at ¶¶ 65, 77; Perez PSR at ¶¶ 64, 70); Franco PSR at ¶ 53; Solorio PSR at ¶ 44). With these adjustments, Probation calculated adjusted offense levels for each of the murder "pseudo-counts." After combining and adjusting the multiple "pseudo counts" under U.S.S.G. § 3D1.4, as instructed to do so by Application Note 1, the combined adjusted offense level for Count One was determined for each defendant. *See* Cervantes PSR at ¶¶ 82–89; Perez PSR at ¶¶ 75–81); Franco PSR at ¶¶ 58–64). Probation then determined which offense level was greater as set forth in § 2E1.1(a), and then proceeded to calculate each defendant's total offense level. *Id.*

For Cervantes, the total offense level comes to 43. Cervantes PSR at ¶ 89. The government also agrees with Probation's calculation that Cervantes has 3 criminal history points, placing him in Criminal

History Category II. Cervantes PSR at ¶ 101. A Total Offense Level of 3 and CHC II yields an advisory Guidelines range of life.

For Perez, the total offense level also comes to 43. Perez PSR at ¶ 81. The government also agrees with Probation's calculation that Perez has 6 criminal history points, placing him in Criminal History Category II. *Id*. at ¶ 90. A Total Offense Level of 43 and CHC III yields an advisory Guidelines range of life.

For Franco, the total offense level comes to 41. Franco PSR at ¶ 64. The government also agrees with Probation's calculation that Franco has 3 criminal history points, placing him in Criminal History Category II. *Id*. at ¶¶ 72–74. A Total Offense Level of 41 and CHC II yields an advisory Guidelines range of 360 months to life.

For Solorio, the total offense level comes to 39. Solorio PSR at ¶ 51. The government also agrees with Probation's calculation that Solorio has three criminal history points, placing him in Criminal History Category II. *Id*. at ¶¶ 57–59. A Total Offense Level of 39 and CHC II yields an advisory Guidelines range of 292 months to 365 months.

Cervantes, Perez, and Franco object to Probation's calculations, arguing that (1) the grouping rules of § 3D1.4 do not apply because there was only a single count of conviction in this case (the RICO conspiracy count); and (2) the leader enhancement is inappropriate. Given that the United States is recommending sentences well below the calculated ranges—even if the defense objections are sustained—the government notes that the objections are somewhat academic. Nevertheless, the government responds below.

*Grouping.* When a defendant is convicted of a RICO offense, the defendant's base offense level under the sentencing guidelines is the greater of 19 or "the offense level applicable to the underlying racketeering activity." USSG § 2E1.1(a)(1), (2). The term "racketeering activity" is defined in Title 18, Section 1961 of the United States Code, and includes multiple types of violations, including "any act . . . involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961. In this case, as set forth below and in the respective PSRs, Probation correctly considered each of the proven murder conspiracies and attempted murders as separate "pseudo counts" under § 2E1.1(a)(2) to calculate the applicable offense level and "apply the greater" level, as the

guideline instructs. Probation did so by evaluating the adjustments in Chapter 3, which is consistent with the commentary to § 2E1.1. Specifically, the commentary to § 2E1.1 provides that "[w]here there is more than one underlying offense," the district court should "treat each underlying offense as if contained in a separate count of conviction for the purposes of" determining the greater offense level. *See id.* § 2E1.1, comment. (n.1). In doing so, Application Note 1 directs the sentencing court to apply the adjustments contained in Chapter 3 of the Sentencing Guidelines, including grouping.

The defense argues that the plain language of § 2E1.1(a) is unambiguous, and that this Court may not, therefore, consider the commentary. The defendants appear to be arguing that although this Court may evaluate each separate racketeering act to determine the applicable Base Offense Level, the Court may not consider any adjustments under Chapter 3, meaning that the relevant comparison under § 2E1.1 is 19 and 33 (33 being the Base Offense Level applicable to either first degree murder or murder conspiracy). The government believes that § 2E1.1(a) is ambiguous, and thus reaches a different outcome. Specifically, this section sets forth the way a sentencing court is to calculate the "Base Offense Level" in RICO cases. The section uses the term "Base Offense Level" in section (a), but then states that to calculate the greater Base Offense Level as between (a)(1) and (a)(2), a sentencing court must calculate the "*offense level* applicable to the underlying racketeering activity." *See* § 2E1.1(a)(2) (emphasis added). The guideline does not repeat the phrase "Base Offense Level," nor does it use the term "adjusted offense level," nor does it provide for how to proceed when there is more than one "underlying racketeering activity" (which there necessarily must be in RICO conspiracy cases, where at least two acts are required to form a "pattern of racketeering," *see* 18 U.S.C. § 1961(5)).

Therefore, the government believes that this Court may look to the commentary to guide the calculations in this case because the plain language of § 2E1.1 is ambiguous with respect to the phrases "offense level" and "underlying racketeering activity." In construing the meaning of a guideline provision, courts are bound by precedent. *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("First, we look to see whether our prior precedent forecloses Kirilyuk's challenge to Application Note 3(F)(i)."). Beyond that, courts must apply traditional rules of statutory construction to the Guidelines, centering on the text and structure of the guidelines provisions themselves, with reference to common contemporary understandings of words. *United States v. Scheu*, 83 F.4th 1124, 1128–29 (9th Cir. 2023).

21-CR-328-YGR
SENTENCING MEMORANDUM         10

Where the meaning of a provision is ambiguous, courts must look to the application notes, which serve to interpret and explain the guidelines for district courts. *United States v. Kirilyuk*, 29 F.4th 1128, 1136 (9th Cir. 2022); *see Kisor v. Wilkie*, 588 U.S. 558, 573–77 & n.3 (2019) (explaining deference to an agency's reasonable interpretation of regulation, of which *Stinson v. United States*, 508 U.S. 36 (1993) is an example, applies "only if a regulation is genuinely ambiguous," "even after a court has resorted to all the standard tools of interpretation," although in the absence of presumptive deference, a court may still find agency interpretation persuasive). Where it is appropriate to look to the commentary, they are "treated as an agency's interpretation of its own legislative rule," and must be given "'controlling weight unless . . . plainly erroneous or inconsistent with the regulation.'" *Stinson*, 508 U.S. at 45; *see Kirilyuk*, 29 F.4th at 1149 (Bress, J., dissenting) ("[O]ur circuit has continued to apply *Stinson* to Guidelines commentary after *Kisor*. … In this circuit, *Stinson* is still the governing law for Guidelines commentary." (internal citations omitted)).

Here, as noted above, the commentary to § 2E1.1 provides that "[w]here there is more than one underlying offense," the district court should "treat each underlying offense as if contained in a separate count of conviction for the purposes of" determining the greater offense level. *See id.* § 2E1.1, comment. (n.1). This case did of course involve more than one underlying offense (each Special Sentencing Factor was its own offense involving murder, each with a different victim, whose rights ought to be vindicated, including through an appropriate Guidelines calculation), and thus, Probation is correct that to determine the relevant "offense level" for purposes of § 2E1.1, the offense level for Count One must be calculated using § 3D1.4. *See, e.g.*, *United States v. Hinton*, No. 23-1018, 2024 WL 2317661, at *1 (7th Cir. May 22, 2024) ("The corrected presentence investigation report (PSR) used three racketeering acts to determine [the defendant's] offense level under the Sentencing Guidelines." (citing U.S.S.G. § 2E1.1(a)(2), cmt. n.1)); *United States v. Ortiz*, No. 22-2581, 2024 WL 368377, at *1 (7th Cir. Jan. 31, 2024) (affirming district court's grouping of various racketeering activities the highest adjusted offense level would determine the offense level for the § 1962(d) violation, so long as it was greater than 19 (interpreting U.S.S.G. § 2E1.1); *Cano v. United States*, No. 3:13-CR-4514-BEN-10, 2020 WL 520898, at *1 (S.D. Cal. Jan. 31, 2020) (recounting the parties' joint recommendation regarding the Guidelines in a case involving one count of 18 U.S.C. § 1962(d), with racketeering acts

including Conspiracy to Distribute Controlled Substances, Money Laundering, and Extortion).

Doing so also makes good sense, because, as a matter of policy, where a defendant is charged with and found guilty beyond a reasonable doubt of multiple racketeering acts—particularly those involving different victims—grouping should occur for purposes of calculating the offense level. To do otherwise would not vindicate the rights of each individual victim. *See generally United States v. Yafa*, No. 23-4108, 2025 WL 1404271, at *4 (9th Cir. May 15, 2025) ("The Yafas's narrow interpretation would hamstring courts in fulfilling this purpose and prevent them from adequately assessing a defendant's culpability in fraud convictions where actual loss may be difficult to assess."); *see generally United States v. Gordon*, 202 F. Supp. 3d 81, 85 (D.D.C. 2016) ("According to the 1998 Federal Sentencing Guidelines Manual, effective at the time of the sentencing, the sentencing range for a defendant who has committed multiple racketeering acts is determined by 'treat[ing] each underlying offense as if contained in a separate count of conviction.' 1998 U.S.S.G. § 2E1.1 cmt. n. 1. Here, the four underlying racketeering acts are actually treated as five different convictions, because each homicide had a separate victim.").

***Leader Enhancement.*** The defendants also each object to the "leader/organizer" role adjustment in Probation's calculations. These objections should be overruled. Sentencing Guidelines Section 3B1.1 "provides for upward adjustments based on the defendant's role in the offense." *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996). Specifically, a district court may increase a defendant's offense level by four levels if the defendant was an "organizer or leader of criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). To apply the four-point upward adjustment, "a preponderance of the evidence must support a finding that the defendant was an organizer or leader, 'not merely that the defendant was more culpable than others who participated in the crime.'" *Avila*, 95 F.3d at 889 (quoting *United States v. Harper*, 33 F.3d 1143, 1150 (9th Cir. 1994)). "[T]o sustain a finding that a defendant was an organizer or a leader, 'there must be evidence that the defendant 'exercised some control over others involved in the commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime.'" *Id.* (quoting *Harper*, 33 F.3d at 1151). In determining whether a defendant controlled or organized others, the district court should consider the following factors: "(1) the exercise of decision making authority,

(2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others." *United States v. Lopez-Sandoval*, 146 F.3d 712, 717 (9th Cir. 1998) (quoting U.S.S.G. § 3B1.1, comment n. 4). The Ninth Circuit has emphasized "the disjunctive" nature of the "rule stated in *Avila*," holding that "a finding that [the defendant] 'exercised control over others' is superfluous where . . . the sentencing court properly concludes that the defendant organized or led a conspiracy of the scope depicted under U.S.S.G. § 3B1.1(a)." *United States v. Ingham*, 486 F.3d 1068, 1076 (9th Cir. 2007).

Here, all four defendants organized or led a conspiracy of the scope depicted under U.S.S.G. § 3B1.1(a). The record is replete with evidence that, as members of the General Council—whether in the capacity of a "General" or an "advisor" to the Generals—the defendants were the leaders of an organization that had murder as one of the tools available to enforce its will upon the community, upon rival gangs, upon its own members, and upon members of affiliated street gangs. All four defendants, as members of the GC, had organizational authority over the conspiracy, and evidence at trial showed the manner in which each defendant exercised that authority as part of the criminal conspiracy. Their relative culpability is irrelevant. *Avila*, 95 F.3d at 889.

## IV.     SENTENCING RECOMMENDATIONS

As noted above, the government recommends a sentence of 300 months for Cervantes, 300 months for Perez, 240 months for Franco, and 240 months for Solorio, to be served in federal custody immediately. Considering the factors set forth in 18 U.S.C. § 3553(a), the government believes these sentences are sufficient, but not greater than necessary, to fulfill the purposes of sentencing, and are proportionate to each trial defendant's involvement in the NF as compared to other sentenced co-defendants.

First, the defendants' crimes are extremely serious. 18 U.S.C. § 3553(a)(1)(A). Having already been sentenced to lengthy prison terms for violent conduct, none of the trial defendants desisted from criminal activity. Rather, each joined a violent and lucrative prison gang, facilitating the trade of harmful drugs both inside and outside prison and rising through the ranks to the highest tier of the

enterprise. From their respective perches, these trial defendants directed criminal activity on the streets of multiple counties throughout Northern and Central California, including large-scale drug sales, and were part of the central decision-making body for the NF. In those roles, each defendant was partly responsible for various combinations of attempted murder and murder conspiracy, including the attempted murder of Matt Rocha, who was stabbed numerous times in the chest and torso for his disloyalty to the gang, and whose attack set off a riot on the prison yard that resulted in serious injuries to other inmates. Also in those roles, each defendant must be punished for the less obvious but arguably more pernicious aspect of being the leaders of such a criminal enterprise: their role in enlisting new members, spawning generations of new gang recruits and infecting younger members of the community with the desire and ability to continue the NF's cycle of violence.

Given the seriousness of the defendants' conduct, the government's proposed sentences (which constitute a significant downward variance from the applicable Guidelines ranges), would be insufficient to satisfy the goals of sentencing if not for one important factor: each defendant is already serving a significant state sentence. Thus, as has been its practice for all other incarcerated co-defendants sentenced thus far in this case, the government recognizes that the need to protect the public from further crimes is somewhat less acute when the defendant will not be released from custody in the near-term regardless the federal sentence. 18 U.S.C. § 3553(a)(2)(C).

With respect to Cervantes and Perez, who were two of the three top leaders of the criminal enterprise throughout the conspiracy period, a sentence of 300 months is also appropriate in light of the sentences imposed on longtime GC members Luna and Guillen, who were similarly charged with multiple murder attempts and conspiracies, pled guilty well before trial, accepted responsibility for their conduct, who both received 175 months. Regarding Franco and Solorio, 240 months would also appropriately place them with NF member Martinez, who also was a member of the IC and who pled guilty to significant drug trafficking activities and the attempted murder of Rocha, and who received a 144-month sentence. The government's proposed sentences would ensure that each defendant receives a sentence commensurate with their degree of involvement in the criminal conspiracy. 18 U.S.C. § 3553(a)(6).

The government also believes that its proposed sentences could have a deterrent effect on other

life-term inmates in California state prisons, who might otherwise have limited incentive to avoid committing crimes while incarcerated. *Id*. § 3553(a)(2)(B). The California Department of Corrections and Rehabilitation has limited tools for discouraging misconduct by life-term inmates because it is unable to extend their sentences any further. But the threat of removal from state custody can provide that deterrence. That is particularly true for members of California prison gangs in the high-ranking positions of these four high-ranking defendants, who will suffer the added sanction of being removed from a familiar environment where they enjoyed high status among fellow inmates.

The government is mindful of the mitigating factors noted in each defendant's sentencing memo and respective PSR, including age, medical conditions, difficult childhoods, the needs of family members, and recent efforts at rehabilitation. While the government does not minimize these factors, it believes that such considerations are already incorporated in the proposed sentences, which are each substantial downward variances from the applicable Guidelines. Any further reductions would not adequately reflect the seriousness of the defendants' conduct or deter future misconduct.

## V.   CONCLUSION

For all these reasons, the government respectfully requests that the Court impose a sentence of 300 months in federal custody for Cervantes and Perez and 240 months in custody for Franco and Solorio, to begin immediately, with five years of federal supervised release deferred until after completion of their respective state prison terms.

DATED: May 30, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_____/s/_____
MARJA-LIISA OVERBECK
LEIF DAUTCH
ASEEM PADUKONE
Assistant United States Attorneys